**NON-CONFIDENTIAL**

**2014-1744**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S.,**

              **Plaintiff-Appellant,**

v.

**UNITED STATES,**

              **Defendant-Appellee,**

**and**

**UNITED STATES STEEL CORPORATION,**

              **Defendant-Appellee.**

---

**Appeal from the United States Court of International Trade
in case no. 13-CV-00001, Senior Judge Judith M. Barzilay.**

---

## BRIEF OF PLAINTIFF-APPELLANT BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S.

---

Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Sarah S. Sprinkle

October 24, 2014

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street NW, Suite 600
Washington, D.C. 20005
(202) 408-5153
*Counsel for Borusan Mannesmann*
*Boru Sanayi ve Ticaret A.S.*

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Borusan Mannesmann        v. United States

No. 2014-1744

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellant Borusan Mannesmann certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Borusan Holding; Borusan Mannesmann Boru Yatırım Holding A.Ş. ("BMBYH"); Salzgitter Mannesmann GMBH

_____

4.   ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Morris, Manning & Martin, LLP: Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins and Sarah S. Sprinkle

_____

10/24/2014              ___                    /s/Julie C. Mendoza
            Date                                    Signature of counsel

                                              Julie C. Mendoza
                                              Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

I.    STATEMENT OF RELATED CASES ........................................................1

II.   JURISDICTIONAL STATEMENT ...........................................................1

III.  STATEMENT OF THE ISSUES ...............................................................2

IV.   STATEMENT OF THE CASE ..................................................................2

V.    STATEMENT OF THE FACTS .................................................................6

    A.    Background .......................................................................................6

    B.    Petitioner's Targeted Dumping Allegation...................................7

    C.    Targeted Dumping And Commerce's Post-Preliminary Decision .........9

    D.    Commerce's Final Results ............................................................12

VI.   SUMMARY OF ARGUMENT................................................................14

VII.  ARGUMENT............................................................................................17

    A.    Standard Of Review......................................................................17

    B.    Commerce's Refusal To Consider Undisputed Record Evidence Showing That The Price Differences Identified By The Nails Test Were Not Due To Targeted Dumping Is Contrary To Law ............................17

        1. Background on Targeted Dumping ..................................19

        2. The *Nails* Test................................................................24

        3. The Statute And SAA Provide That Commerce Is To Apply The A-T Methodology Only In Instances Of Targeted Or Masked Dumping. ......................................26

        4. Record Evidence Confirms That Observed Price Differences Are Not Attributable To Targeted Dumping ............................36

    C.    Commerce's Statutory Interpretation  Fails to Take into Account the Statute as a Whole and Leads To An Absurd Result.............................39

i

VIII. CONCLUSION AND STATEMENT OF RELIEF SOUGHT......................44

**CONFIDENTIAL MATERIAL DELETED FROM THE NON-CONFIDENTIAL BRIEF:**  Business proprietary information contained on pages 6, 11 and 37 is deleted from the non-confidential brief.  This business proprietary information is subject to the protective order in the administrative proceeding before the U.S. Department of Commerce and Federal Circuit Rule 28(d).  The material omitted on these pages indicates the cost of raw materials as percentages of the total cost.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.,*
   305 U.S. 315 (1938).................................................................................41

*Beijing Tianhai Indus. Co. Ltd. v. United States,*
   No. 12-00203, Slip Op. 14-104 (Ct. Int'l Trade Sep. 9, 2014)...............32, 33, 34

*Borden, Inc. v. United States,*
   4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998), *rev'd on other grounds*, 7 Fed. Appx.
   938 (Fed. Cir. 2001).......................................................................*passim*

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States,*
   990 F. Supp. 2d 1384 (Ct. Int'l Trade 2014) ............................................*passim*

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984)................................................................................ 17

*In re City of Houston: in Re the Government of the District of Columbia,*
   731 F.3d 1326 (Fed. Cir. 2013) ......................................................... 40

*Comm'r v. Clark,*
   489 U.S. 726 (1989)...............................................................................33

*Corus Staal BV v. Department of Commerce,*
   395 F.3d 1343 (Fed. Cir. 2005) .....................................................21

*Global Commodity Grp. LLC v. United States,*
   709 F.3d 1134 (Fed. Cir. 2013) .....................................................17

*Gold East Paper (Jiangsu) Co. v. United States,*
   918 F. Supp. 2d 1317 (Ct. Int'l Trade 2013) ....................................22

*Huaiyin Foreign Trade Corp. v. United States,*
   322 F.3d 1369 (Fed. Cir. 2003) .....................................................38

*Marbury v. Madison,*
   5 U.S. 137 (1803)..................................................................................40

*Mid Continent Nail Corp. v. United States*,
    712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ......................................................26

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ...........................................................................33

*Thai Plastic Bags Indus. Co. v. United States*,
    746 F.3d 1358 (Fed. Cir. 2014) ...........................................................................17

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004) ...........................................................................34

*U.S. Steel Corp. v. United States*,
    621 F.3d 1351 (Fed. Cir. 2010) .......................................................................4, 34

*U.S. Steel Corp. v. United States*,
    637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) ................................................15, 34

*Walgreen Co. of Deerfield, Il. v. United States*,
    620 F.3d 1350 (Fed. Cir. 2010) ...........................................................................17

*Wirtz v. Glass Bottle Blowers Ass'n*,
    389 U.S. 463 (1968)..............................................................................................41

*Witco Chemical Corp. v. United States*,
    742 F.2d 615 (Fed. Cir. 1984) .............................................................................41

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................17

19 U.S.C. § 1677b(a)(1)(B) .......................................................................................19

19 U.S.C. § 1677b(a)(4).............................................................................................19

19 U.S.C. § 1677b(b) ...........................................................................................19, 41

19 U.S.C. § 1677b(e) .................................................................................................19

19 U.S.C. § 1677f-1(d)(1)..................................................................................*passim*

19 U.S.C. § 3512(d) ...................................................................................................28

28 U.S.C. § 1295(a)(5) (2012) .....................................................................................1

28 U.S.C. § 1581(c) (2012) ........................................................................1

Administrative Procedure Act, Pub.L. 79–404, 60 Stat. 237 (1946)......................22

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994)..15, 19

**Regulations**

19 C.F.R. § 351.301(d)(5) (2007) ............................................................21

19 C.F.R. § 351.414(c)(1) (2012) ............................................................23

19 C.F.R. § 351.414(c)(2) (2010) ............................................................22

19 C.F.R. § 351.414(f)(2) (2007).............................................................22

19 C.F.R. § 351.414(f), (g) .....................................................................21

**Administrative Proceedings**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't of
    Commerce May 19, 1997) ............................................................3, 21

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin
    and Assessment Rate in Certain Antidumping Duty Proceedings; Final
    Modification*, 77 Fed. Reg. 8,101 (Dep't of Commerce Feb. 14, 2012) ......22, 23

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin
    During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722
    (Dep't of Commerce Dec. 27, 2006) ..............................................20

*Certain Steel Nails From the United Arab Emirates: Final Determination of Sales
    at Less Than Fair Value*, 77 Fed. Reg. 17,029 (Dep't of Commerce Mar. 23,
    2012) ....................................................................................42

*Certain Steel Nails From the United Arab Emirates: Notice of Preliminary
    Determination of Sales at Less Than Fair Value and Postponement of Final
    Determination*, 73 Fed. Reg. 3,945 (Dep't of Commerce Jan. 23, 2008) ..........25

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free
    Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,630 (Dep't of
    Commerce Oct. 25, 2007)........................................................20, 21

*Polyvinyl Alcohol From Taiwan: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 5,562 (Dep't of Commerce Feb. 1, 2011)..........................42

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 51 Fed. Reg. 17,784 (Dep't of Commerce May 15, 1986) .........................................................6

*Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008)...................................................................................................22

*Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) ..................................................................................................................30

## Other Authorities

Dan Porter & Ross Bidlingmaier*, Targeted Dumping: The Next Frontier of Trade Remedy Litigation*, 21 Tulane J. Int'l & Comp. L. 261, 491 (2013) ............20, 21

Federal Rule of Appellate Procedure 4(a)(1)(B) .......................................................1

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994)*passim*

Federal Circuit Rule 47.5(a) ......................................................................................1

Federal Circuit Rule 47.5(b) ......................................................................................1

## I.  <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), Plaintiff-Appellant is not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this or any other appellate court.  Pursuant to Federal Circuit Rule 47.5(b), Plaintiff-Appellant is also unaware of any case pending before the U.S. Court of International Trade ("CIT") that will be directly affected by this Court's decision in this case.

## II.  <u>JURISDICTIONAL STATEMENT</u>

Plaintiff-Appellant Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. ("Borusan") appeals from the final judgment of the CIT denying its motion for judgment upon the agency record.  *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 990 F. Supp. 2d 1384 (Ct. Int'l Trade 2014), joint appendix ("JA") 2-9.  The CIT's jurisdiction over the appeal was pursuant to 28 U.S.C. § 1581(c) (2012).

This Court has jurisdiction to review the CIT's decision pursuant to 28 U.S.C. § 1295(a)(5) (2012).

The CIT's Judgment was entered on June 25, 2014.  JA1.  Borusan timely filed its appeal on August 22, 2014, which is within 60 days of entry of judgment as required by Federal Rule of Appellate Procedure 4(a)(1)(B).

III.    **STATEMENT OF THE ISSUES**

(i) Whether the U.S. Department of Commerce ("Commerce") may lawfully apply the exceptional comparison methodology provided for in 19 U.S.C. § 1677f-1(d)(1)(B) to address instances of targeted dumping when undisputed record evidence shows that the pattern of price differences identified by Commerce is accounted for by changes in raw materials costs rather than a practice of selective pricing during a specific time period?

(ii) Whether the statute requires Commerce to explain why observed price differences cannot be taken into account using the normal comparison methodology?

IV.    **STATEMENT OF THE CASE**

Borusan appeals the decision of the CIT affirming Commerce's final results of the antidumping duty administrative review of circular welded carbon steel pipes and tubes from Turkey, which covered Borusan's entries of subject merchandise into the United States between May 1, 2010 and April 30, 2011. *Circular Welded Carbon Steel Pipes and Tubes from Turkey; Final Results of Antidumping Duty Administrative Review; 2010 to 2011*, 77 Fed. Reg. 72,818 (Dep't of Commerce Dec. 6, 2012), JA3301-3, as amended by *Circular Welded Carbon Steel Pipes and Tubes From Turkey; Amended Final Results of Antidumping Duty Administrative Review; 2010 to 2011*, 78 Fed. Reg. 286 (Dep't

of Commerce Jan. 3, 2013), JA3738-9; Issues and Decision Memorandum for the

Final Results of the Antidumping Duty Administrative Review: Circular Welded

Carbon Steel Pipes and Tubes from Turkey – May 1, 2010, through April 30, 2011

(Nov. 30, 2012) ("IDM"), JA3278-96 (collectively, "*Final Results*").

      Dumping margins are calculated in administrative reviews by comparing

normal value (NV) to export price (EP) or constructed export price (CEP).  19

U.S.C. § 1677f-1(d)(1)(A)(i) and (ii) provide that Commerce is required to either

compare weighted average NVs to weighted average EP/CEPs (A-A comparisons),

or the NVs of individual transactions to the EP/CEPs of individual transactions

(T-T comparisons) in an antidumping duty investigation.  The statute, however,

provides an exception that permits Commerce to use a comparison of weighted-

average NVs to the EP/CEPs of individual transactions (A-T comparisons).  This

exception from the standard A-A comparison method applies only if: "(i) there is a

pattern of export prices (or constructed export prices) for comparable merchandise

that differ significantly among purchasers, regions, or periods of time, and (ii) the

administering authority explains why such differences cannot be taken into account

using a method described in paragraph (1)(A)(i) or (ii)."  19 U.S.C. § 1677f-

1(d)(1)(B).  This statutory exception is commonly known as the "targeted

dumping" provision.  *See, e.g.*, *Antidumping Duties; Countervailing Duties*, 62

Fed. Reg. 27,296, 27,374 (Dep't of Commerce May 19, 1997) (Commerce

3

referring to section 777A(d)(1)(B) of the Act as the "targeted dumping" provision); *U.S. Steel Corp. v. United States,* 621 F.3d 1351, 1362 (Fed. Cir. 2010) ("Commerce is able to use an average-to-individual transaction comparison in situations of targeted dumping.").

When Commerce applies the targeted dumping methodology, it not only uses the A-T comparison methodology, but also applies "zeroing" to the results, meaning that any negative dumping margins (where NV is less than EP/CEP) are set to zero and are not permitted to offset positive dumping margins on other comparisons. *Id*. at 1363 (noting that Commerce intends to continue zeroing when applying § 1677f-1(d)(1)(B)).

In this appeal, Borusan challenges Commerce's decision to use the targeted dumping A-T comparison methodology where the only "pattern" of significant price differences identified by Commerce was a result of Borusan increasing its U.S. prices in the months after February 2010, so that U.S. prices in February were lower than prices in the other months of the period. Borusan had only one customer during the entire review period. JA49. Undisputed record evidence showed that Borusan increased its U.S. sale prices to that customer after February because its costs for hot-rolled steel coil, the principal raw material input into circular welded carbon steel tube, increased. JA3141-48, 3229-31. Commerce deemed this fact to be irrelevant to the question of whether targeted dumping was

4

occuring, and Commerce applied the A-T methodology, including zeroing, to all comparisons during the review period. As a result, Borusan's dumping margin, which would have been zero using the normal A-A methodology, was increased to 3.55 percent. JA3739. The CIT affirmed, finding that the statute is "clear" that Commerce is required only to find a pricing pattern as described in the statute and need not conduct any further analysis of whether that pattern is indicative of targeting (which the court characterized as "intent"). 990 F. Supp. 2d at 1389; JA8-9.

It is Borusan's contention that the statute and the accompanying Statement of Administrative Action ("SAA") demonstrate that Congress intended that Commerce would use the targeted dumping methodology only to address instances of actual targeted dumping, and that Commerce must evaluate the significance of any pattern of price differences found and determine on a case-by-case basis whether targeted dumping is occurring and thus whether use of the normal A-A methodology would mask dumping. Commerce is also required to explain separately why the normal methodology could not "take into account" the observed price differences. Congress did not intend for Commerce to use the targeted dumping methodology in a mechanical way without regard to whether the pattern observed was in fact targeted dumping and to penalize companies for the normal commercial practice of passing through higher raw materials costs in their prices.

5

Rather, Congress intended that such price differences could be accounted for using the normal A-A comparison methodology.

## V.    STATEMENT OF THE FACTS

### A.    Background

The antidumping duty order on certain welded carbon steel pipe and tube ("standard pipe") from Turkey was published on May 15, 1986. *Antidumping Duty Order; Welded Carbon Steel Standard Pipe and Tube Products From Turkey*, 51 Fed. Reg. 17,784 (Dep't of Commerce May 15, 1986). Commerce initiated the instant administrative review, covering the period or review ("POR") May 1, 2010 to April 30, 2011 on June 28, 2011. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 37,781, 37,785 (Dep't of Commerce June 28, 2011), JA19, 23. In the course of the administrative review, Borusan submitted information to Commerce showing that during the POR all of it sales were made to a single U.S. customer. JA49. Borusan also provided information establishing (i) that at least one ton of hot-rolled steel coil is consumed for every ton of finished standard pipe produced JA1349-50 and 1382, and (ii) that the hot-rolled steel coil constituted between [ ■ ]% and [ ■ ]% of the total cost of manufacturing standard pipe. JA1890. Borusan also submitted monthly hot-rolled coil costs for ST-37 hot-coil (used to make Grade A standard pipe) and ST-44 hot coil (used to make Grade B standard

pipe) for the POR.  JA2478-9; JA2650-70.  Grade A and Grade B standard pipe
were the only grades of standard pipe that Borusan exported to the United States
during the POR.  JA3215.  The hot-coil costs reported in Exhibit S2D-12 included
the costs of the type of coil consumed in the production of slit coil during each
month of the POR.  JA2663-70.

### B.    Petitioner's Targeted Dumping Allegation

On May 14, 2012, the petitioner, United States Steel Corporation, filed an
allegation that Borusan was engaged in targeted dumping.  JA2820.  Specifically,
U.S. Steel alleged that Borusan was engaged in targeted dumping by "time period"
and based its allegation on a comparison of Borusan's U.S. sales prices in February
2010 with U.S. sales made in the other months of the POR.  JA2824.  Borusan had
only a single customer during this review period.  JA49.  U.S. Steel's targeted
dumping allegation was made based on the so-called "*Nails*-test"[1] that Commerce
applied at that time in evaluating targeted dumping.  *See* JA2822-4.  The remedy
sought by United States Steel Corporation was for Commerce to apply the A-T
comparison methodology with zeroing to all of Borusan's sales – including those
that were not found to be targeted under the *Nails*-test.  *See* JA2826-7.

Borusan opposed the targeted dumping allegation arguing that there was no
basis for finding targeted dumping because the price differences identified in the

---

[1]  *See* discussion at pages 24-26 *infra* (describing *Nails*-test).

allegation between February 2010 and the later months of the POR were not due to

"targeted dumping" but were instead due to the fact that hot-rolled coil costs had

increased between these time periods.  *See* JA2854-61.  As support, Borusan cited

to Commerce's determination in the previous review covering the period May 1,

2009 to April 30, 2010, in which Commerce had determined that rapidly changing

costs of hot-rolled steel coil had had a significant impact on Borusan's cost of

manufacturing ("COM").  JA2856-7.  Commerce had determined in that review

that the changes in COM attributable to these changing hot-rolled coil costs were

linked to the changes in the prices of the finished standard pipe sold in the home

and U.S. markets.[2]  Commerce had resorted to its quarterly cost methodology in

the face of these rapidly changing costs and prices.  *See id.* at 4-6, JA2856-8 (*citing*

Issues and Decision Memorandum for the Final Results of the Antidumping Duty

Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from

Turkey – May 1, 2009, through April 30, 2010 (Dec. 2, 2011) at Comment 1).

Based on these determinations, in that previous review Commerce had used

---

[2] The reason February 2010 sales were included in the instant review because the U.S. date of sale reported by Borusan and used by Commerce is the contract date, which can be a date months before the merchandise actually enters the United States.  *See* JA1237.  Thus, some sales with contract dates in February 2010 were entered into the United States during the May 1, 2010 to April 30, 2011 POR. Because Commerce reviews entries that were made during the relevant period of review, these February sales were part of the 2010-2011 POR at issue in this case. *See* JA3292 (Commerce agreeing with Borusan that it must modify its comparison market program to include all of Borusan's sales starting three months before the first reported date of U.S. sale of February 2010).

quarterly average costs, rather than the normal average annual cost, to calculate cost of production in that review to better match costs to home market sales. *Id.*

Borusan also requested that before acting on the targeted dumping allegation Commerce issue a supplemental questionnaire requesting hot-rolled coil cost data for the month of February 2010 – which was the month that United States Steel Corporation alleged Borusan had engaged in targeted dumping – because that information was not on the record of this review. *See* JA2858-9.

On June 1, 2012, Commerce published the *Preliminary Results* in the *Federal Register*. 77 Fed. Reg. at 32,508, JA3122. Borusan received a dumping margin of zero (*de mimimis*). *Id.* at 32,512, JA3130. With respect to the issue of targeted dumping, Commerce stated that it did not conduct the targeted dumping analysis and instead applied its normal monthly weighted average-to-average (hereinafter "A-A") comparison methodology without zeroing (*i.e.*, granting offsets for negative dumping margins). *See id.* at 32,510, JA3126.

### C.    Targeted Dumping And Commerce's Post-Preliminary Decision

Following the submission of case and rebuttal briefs, Commerce issued a post-preliminary decision and calculation memorandum in which it found that Borusan had engaged in targeted dumping under the *Nails* test. JA3200-6. As a result of this targeted dumping determination, and Commerce's remedy of applying the A-T comparison methodology to all of Borusan's sales with zeroing

(*i.e.*, without granting offsets), Borusan's dumping margin went from zero to 2.12%. *See* JA3203; JA3205-6. Commerce also established a second briefing schedule so that parties could address its post-preliminary targeted dumping determination.

On October 25, 2012, Commerce issued a supplemental questionnaire to Borusan requesting that it provide a monthly inventory movement table for hot-rolled coil by grade for the months of February, March and April 2010. JA3207. Borusan submitted its response on October 29, 2012, and provided a monthly inventory movement table for the hot-rolled coil for the period November 1, 2009 to April 30, 2011. *See* JA3209, 3215-23. Borusan's inventory movement table included the months requested by Commerce as well as additional months, and was provided for all grades of hot-rolled coil used by Borusan to produce the subject merchandise that was exported to the United States. JA3215-23. This included ST-37 grade hot-rolled coil that is used by Borusan to produce Grade A standard pipe, and ST-44 grade hot-rolled coil used to produce Grade B standard pipe. *See id.* As mentioned, Grade A and Grade B standard pipe were the only grades of standard pipe that Borusan exported to the United States during the POR. JA3215. The hot-rolled coil cost data showed that the cost of hot-rolled coil increased substantially between the allegedly targeted month of February 2010 and the other months of the POR. *See* JA3215-23.

10

On November 5, 2012, Borusan submitted its comments on Commerce's post-preliminary analysis and calculation memoranda related to targeted dumping issues. *See* JA3224. Borusan argued that Commerce "should examine whether differences in the cost of the primary raw material input into standard pipe – hot-rolled coil – account for the differences in the prices of finished products observed between the different time periods." JA3229 (footnote omitted). As support, Borusan argued that such an examination was especially necessary in this case because the hot-rolled coil accounts for [ ▮ ] – [ ▮ ]% of the cost of manufacturing of the finished standard pipe. *See* JA3229-31. Borusan also argued that the allegedly targeted sales in February 2010 were part of the previous POR in which Commerce had made a final decision that there was a correlation between significantly changing hot-rolled coil costs and standard pipe prices such that it was appropriate to use quarterly instead of annual costs. *See* JA3230 (*citing* Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from Turkey – May 1, 2009, through April 30, 2010, (Dec. 2, 2011) at Comment 1.

To support its argument that it was the changes in hot-rolled coil costs, and not targeted dumping behavior, that accounted for the differences in prices between the time periods which served as the basis for Commerce's post-preliminary targeted dumping decision, Borusan provided a modified *Nails*-test

11

analysis. JA3231-47. This analysis involved deducting the monthly cost of one ton of hot-rolled coil consumed in the production of subject merchandise from the U.S. prices used in the *Nails* test targeted dumping analysis. *See* JA3231-2. Specifically, Borusan deducted the monthly cost of ST-37 grade hot-rolled coil from the prices of Grade A subject merchandise sold to the United States and the monthly cost of ST-44 grade hot-rolled coil from the prices of Grade B subject merchandise sold to the United States. *See id.* Borusan's analysis showed that "{a}fter making this adjustment, none of the sales identified by U.S. Steel as targeted meets the accepted definition of targeted dumping." *Id.* JA3232 (footnote omitted).

### D.    Commerce's Final Results

In the *Final Results*, Commerce followed its post-preliminary results determination and continued to find that Borusan had engaged in targeted dumping. 77 Fed. Reg. at 72,819, JA3301-3; JA3280-91. With respect to Borusan's argument that the observed price differences between time periods was due to changes in hot-rolled coil costs, and not targeted dumping, Commerce rejected it. *See* JA3290. Commerce stated, in relevant part:

> The Act does not require the Department to discern why such patterns arise. Instead, the Act asks the Department to focus on U.S. sales alone — *i.e.,* export price or constructed export price . . . For these same reasons, the Department also rejects Borusan's proposal to modify the *Nails* test by deducting the monthly cost of hot-rolled coil consumed in production from

12

the prices of subject merchandise before performing the
targeted dumping analysis.

JA3290.  Commerce did not, however, specifically address the factual information

that Borusan had submitted in support of its argument that changes in hot-rolled

coil costs were the reason for the observed price differences.  *See id.*  Nor did

Commerce address the veracity of the modified *Nails* test that Borusan had

submitted to support its argument.  *See id.*  The final dumping margin for Borusan

in the *Final Results* was 6.05%.  77 Fed. Reg. at 72,820, JA3303.  Following

correction of a ministerial error that was unrelated to the targeted dumping issue,

Commerce published an amended final results in which Borusan's dumping

margin was reduced from 6.05% to 3.55%.  *See Circular Welded Carbon Steel*

*Pipes and Tubes From Turkey; Amended Final Results of Antidumping Duty*

*Administrative Review; 2010 to 2011*, 78 Fed. Reg. 286, 287 (Dep't of Commerce

Jan. 3, 2013), JA3738-9.  The targeted dumping decision was unchanged.

Upon appeal before the CIT, neither Commerce nor defendant intervenors

disputed Borusan's argument that the differences in prices between Borusan's sales

to its sole U.S. customer in February of 2010 and in later months was attributable

to increases in Borusan's costs of hot-rolled steel coil.  The lower court held that

Commerce was not required to consider this information.  The court concluded that

targeted dumping is merely a "a statutorily defined pricing pattern that permits

Commerce to apply an alternative comparison methodology in antidumping

13

investigations and reviews," 990 F. Supp. 2d at 1388, JA7, and concluded that

Commerce was under no obligation to consider whether a pattern of price

differences as defined by the statute may be attributable to factors other than

targeted dumping:

> The statute is clear.  Contrary to Borusan's claim that targeted
> dumping connotes purposeful behavior, the language of the statute
> simply instructs Commerce to consider export sales price (or
> constructed export sales price) in its targeted dumping analysis. *See* §
> 1677f–1(d)(1)(B).  It does not require Commerce to undertake an
> investigation of the various reasons why a pattern of targeted dumping
> exists within a given time period.  The SAA does not manifest such a
> requirement either.  It reaffirms the language in the statute but adds
> very little other than what is already expressed in § 1677f–1(d)(1)(B).
> Therefore, Commerce may make a finding of targeted dumping and
> apply the targeted dumping remedy based on the pricing pattern
> described in the statute and specifically articulated in the *Nails* test.
> The court cannot identify any language in the statute or SAA that
> might require Commerce to investigate whether a given respondent
> has a legitimate commercial reason for such a pricing practice.  Doing
> so would add a new element to the targeted dumping analysis,
> requiring Commerce to also consider whether respondents intended to
> engage in targeted dumping.

990 F. Supp. 2d at 1389, JA8-9.  Characterizing Borusan's statutory argument as

requiring Commerce to determine an exporter's "intent," the court concluded that

"{t}he court, therefore, cannot read into the statute some sort of 'intent'

requirement that does not exist." *Id.*

## VI.  <u>SUMMARY OF ARGUMENT</u>

Commerce's targeted dumping determination is unlawful because

Commerce ignored undisputed evidence that the observed price differences that it

relied upon to support its affirmative targeted dumping determination were due to changes in hot-rolled coil raw material costs and not due to selectively targeting certain time period for below-fair value sales. Congress intended that the targeted dumping provision of the law apply only "where targeted dumping may be occurring." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ("SAA"), at 843. "Targeted dumping occurs where a foreign exporter or producer selectively sells merchandise at less than fair value in certain product lines, to certain customers, regions, or at certain times of the year." *U.S. Steel Corp. v. United States*, 637 F. Supp. 2d 1199, 1216 (Ct. Int'l Trade 2009) (emphasis added).

To apply the targeted dumping methodology, Commerce (i) must find that there is a pattern of export prices that differ significantly among purchasers, regions, or time periods so that targeted dumping "may be occurring" and (ii) explain why such differences cannot be taken into account using the normal price comparison methodology (*i.e.*, whether the observed pattern is in fact targeted dumping, such that the normal methodology would "mask" dumping). 19 U.S.C. § 1677f-1(d)(1). Commerce in this case applied a statistical test to identify a pattern of differing export prices. But as explained in the SAA, identifying such a pattern shows only that targeted dumping *may* be occurring. Commerce wholly failed to explain why that pattern of price differences, which affirmative and

undisputed evidence showed merely reflected changes in raw materials costs and not targeting, could not be accounted for by applying the normal A-A comparison methodology.

The undisputed record evidence shows that the price differences between February and the other months of the period that Commerce relied upon as the basis for its targeted dumping determination were due to changes in the cost of the primary input into the production of standard pipe – hot-rolled coil – that were reflected in Borusan's U.S. prices. In other words, the observed price differences between time periods reflect the antithesis of dumping – Borusan's prices were lower in February not because it was somehow "targeting" that month to make selectively lower-priced sales, but rather because it increased its prices in subsequent months in response to higher raw materials costs so that it would not be selling below cost. In ignoring this undisputed evidence, and instead relying solely on a mechanical test to identify price differences to support its finding of targeted dumping, Commerce has contravened Congressional intent and reached an absurd result. Commerce also failed to provide a sufficient explanation of why the normal methodology would not account for the significant price differences observed. Commerce merely found that there was a material difference in the resulting margin based on whether the A-T or A-A methodology was used and therefore it failed to satisfy the statutory requirement.

16

# VII.  ARGUMENT

## A.    Standard Of Review

This Court reviews antidumping determinations made by Commerce using the same standard of review as used by the CIT.  *Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013); *Walgreen Co. of Deerfield, Il. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010).  Accordingly, this Court will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  This Court has held that it conducts *de novo* reviews of questions of law and is guided by *Chevron* when determining whether Commerce "correctly construed provisions of the antidumping statute."  *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1364 (Fed. Cir. 2014).  Accordingly, if "Congress has directly spoken to the precise question at issue . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

## B.    Commerce's Refusal To Consider Undisputed Record Evidence Showing That The Price Differences Identified By The Nails Test Were Not Due To Targeted Dumping Is Contrary To Law

According to the statutory construction applied by Commerce and affirmed by the lower court, Commerce may apply the alternative A-T comparison methodology provided for in 19 U.S.C. § 1677f-1(d)(1)(B) by mechanically

applying a statistical analysis to decide whether there is a "pattern" of export prices that "differ significantly" among purchasers, regions, or time periods.  If the result of that statistical test, which during the time period covered by this review was the "*Nails* Test," exceeds a certain threshold, then Commerce will use the A-T comparison methodology without further analysis of whether, under the facts of the particular case, that pattern is reflective of targeted dumping or reflects some other cause.  Both Commerce and the lower court deemed it irrelevant that uncontested record evidence shows that, in this review, the higher prices that Borusan charged to its U.S. customer in the months after February of 2010 merely reflected higher costs for hot-rolled steel coil.

This statutory construction conflicts with Congressional intent as reflected in the Uruguay Round Agreements Act Statement of Administrative Action ("SAA"). The SAA makes clear that an observed pattern of price differences is merely evidence that targeted dumping "may" be occurring, and that Commerce must then evaluate on a case-by-case basis whether such price differences can be accounted for using the normal A-A methodology.  Moreover, this interpretation results in an absurd result that is inconsistent with the purpose underlying the antidumping law, of which § 1677f-1(d)(1)(B) is only one part.  Under the antidumping statute, foreign exporters are required to increase their prices when their costs increase – to

do otherwise would result in dumping margins.[3]  Yet, where as here, a significant

cost increase leads to increased prices in later months, Commerce interprets §

1677f-1(d)(1)(B) as penalizing that price adjustment by applying a less favorable

comparison methodology whose purpose is to reveal "masked dumping."

Commerce's statutory construction is unreasonable and should be reversed by this

Court.

### 1.    Background on Targeted Dumping

The targeted dumping provision was added as part of the changes to U.S.

law that resulted from the Uruguay Round Agreements Act, Pub. L. No. 103-465,

108 Stat. 4809 (1994) ("URAA").  Prior to that time, Commerce's practice was to

use the A-T methodology in making antidumping comparisons.  As a result of the

Uruguay Round modifications, for the first time U.S. law required that A-A

comparisons be made in investigations in accordance with the new WTO Anti-

dumping Agreement.  For the first decade after the law's enactment, parties rarely

alleged targeted dumping, and Commerce applied the new A-A methodology

---

[3] If a producer does not pass along higher material costs in its U.S. prices, then such prices will be found to be below normal value.  If the producer raises its home market prices to reflect the increased costs but keeps the U.S. prices the same, then a comparison of its U.S. and home market prices will show a dumping margin.  *See generally* 19 U.S.C. § 1677b(a)(1)(B) (defining normal value).  If the producer does not increase its home market prices to reflect the higher costs either, then those home market prices will be found to be below the cost of production.  *See* 19 U.S.C. § 1677b(b).  In that case, normal value will be based on a constructed value that reflects the actual (increased) material costs, as well as amounts for general expenses and profit.  *See* 19 U.S.C. §§ 1677b(a)(4) & 1677b(e).

consistently in reviews.  In fact, the targeted dumping provision was used in just

one antidumping case between the URAA's enactment in 1995 and 2006.  *See* Dan

Porter & Ross Bidlingmaier*, Targeted Dumping: The Next Frontier of Trade

Remedy Litigation*, 21 Tulane J. Int'l & Comp. L. 485, 491 (2013).

### a)    Relationship To Zeroing

This changed in December 2006, when Commerce, in response to several

adverse WTO decisions, eliminated the use of "zeroing" in antidumping duty

investigations.  Commerce limited this change in practice regarding zeroing only to

comparisons when using the A-A comparison method.  *See Antidumping

Proceedings: Calculation of the Weighted-Average Dumping Margin During an

Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dep't of

Commerce Dec. 27, 2006).  Commerce's position was that the use of zeroing

would continue in cases where it found targeted dumping and applied the

alternative A-T comparison method.

Not surprisingly, the targeted dumping provision received renewed attention

following the elimination of zeroing when applying the A-A method.  Beginning

with the *Coated Free Sheet Paper* investigation in 2007, targeted dumping

allegations increased significantly because a finding of targeted dumping meant

that Commerce would apply the A-T comparison method and would also apply

zeroing.  *See Notice of Final Determination of Sales at Less Than Fair Value:*

*Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,630, 60,631

(Dep't of Commerce Oct. 25, 2007).  Zeroing out negative dumping margins leads

to higher overall dumping margins.  *See generally, Corus Staal BV v. Department*

*of Commerce*, 395 F.3d 1343, 1345-1346 (Fed. Cir. 2005); *Borden, Inc. v. United*

*States*, 4 F. Supp. 2d 1221, 1226 (Ct. Int'l Trade 1998), *rev'd on other grounds*, 7

Fed. Appx. 938 (Fed. Cir. 2001) (discussing how A-T with zeroing amplifies

dumping margins).  Consequently, between 2007 and June 2012, Commerce

initiated 92 antidumping cases, and conducted an investigation into targeted

dumping in more than half of those cases (47 of those cases). *See Targeted*

*Dumping: The Next Frontier of Trade Remedy Litigation*, 21 Tulane J. Int'l &

Comp. L. at 496.

### b)    Commerce's Targeted Dumping Regulation

In 1997, as part of its comprehensive revision to the antidumping regulations

to reflect the URAA changes, Commerce had promulgated a regulation outlining

its practice regarding the application of the targeted dumping provision.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,374-76

(Dep't of Commerce May 19, 1997) (codified in 19 C.F.R. § 351.414(f) and (g)

and 19 C.F.R. § 351.301(d)(5) (2007)).  That regulation provided that when

applying the A-T methodology to address targeted dumping, Commerce would

normally limit the application of the A-T method to only the sales found to be

targeted.  19 C.F.R. § 351.414(f)(2) (2007).  However, after Commerce ended the

practice of zeroing under A-A method, Commerce abruptly withdrew that

regulation.  *See Withdrawal of the Regulatory Provisions Governing Targeted*

*Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of

Commerce Dec. 10, 2008).  Since that time, Commerce's practice has been that

when it finds targeted dumping, it applies the A-T methodology – with zeroing – to

*all* comparisons during the period, targeted and non-targeted.[4]

### c)     Application To Administrative Reviews

Despite the elimination of zeroing in investigations using the A-A

comparison method, Commerce continued to use zeroing in administrative reviews

in which its regulatory preference was to use the A-T comparison methodology.

*See* 19 C.F.R. § 351.414(c)(2) (2010).  This too changed in February 2012 (as a

result of adverse WTO decisions on zeroing), when Commerce announced that it

would no longer apply the A-T comparison methodology in reviews but would

instead apply a monthly A-A comparison methodology <u>without</u> zeroing.  *See*

*Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin*

*and Assessment Rate in Certain Antidumping Duty Proceedings; Final*

*Modification*, 77 Fed. Reg. 8,101 (Dep't of Commerce Feb. 14, 2012) ("*Final*

---

[4] Commerce's withdrawal of its targeted dumping regulation has been held to
have violated the Administrative Procedure Act, Pub.L. 79–404, 60 Stat. 237
(1946)..  *Gold East Paper (Jiangsu) Co. v. United States*, 918 F. Supp. 2d 1317
(Ct. Int'l Trade 2013).

*Modification for Reviews*") (codified in 19 C.F.R. § 351.414(c)(1) (2012)).[5]

Commerce also stated in the *Final Modification for Reviews* that its adoption of

this A-A comparison methodology without zeroing in reviews parallels "the WTO-

consistent methodology that the Department applies in original investigations." *Id.*

Although mandating the use of the A-A comparison methodology without

zeroing in reviews, Commerce's new regulation also provides that Commerce can

depart from this A-A comparison methodology if it "determines another method is

appropriate in a particular case." 19 C.F.R. § 351.414(c)(1) (2012). Commerce

indicated that it "will determine on a case-by-case basis whether it is appropriate to

use an alternative comparison methodology by examining the same criteria that the

Department examines in original investigations pursuant to section 777A(d)(1)(A)

and (B) of the Act." *Final Modification for Reviews*, 77 Fed. Reg. at 8,102. In

other words, Commerce's revised regulations reserve the option of applying the A-

T comparison methodology (with zeroing) in reviews if it finds targeted dumping –

just like in original investigations.

Although the targeted dumping provision by its terms applies only in

original investigations, Commerce has taken the position that it can also apply the

---

[5] This new monthly A-A comparison method without zeroing in administrative reviews is applicable to reviews in which the preliminary results were issued after April 16, 2012. It was thus applicable in the review at issue in this appeal, in which the *Preliminary Results* were issued in June 2012. *See* JA3122-32. Thus, had Commerce not found targeted dumping it would have applied a monthly A-A comparison without zeroing to Borusan's sales in this review.

targeted dumping provision in administrative reviews as the basis for applying the

A-T comparison method with zeroing.  Specifically, as Commerce stated in the

*Final Results*:

> Although section 777A(d)(1)(B) of the Act does not strictly govern
> the Department's examination of this question {i.e., targeted
> dumping} in the context of an administrative review, the Department
> nevertheless finds that the issue arising under 19 CFR 351.414(c)(1)
> in an administrative review is, in fact, analogous to the issue in
> antidumping investigations.  Accordingly, the Department finds the
> analysis that has been used in antidumping investigations instructive
> for purposes of examining whether to apply an alternative comparison
> method {*i.e.*, A-T with zeroing} in this administrative review.

JA3287.

## 2.    The *Nail*s Test

Consistent with its view that targeted dumping in reviews is the same as

targeted dumping in original investigations, Commerce analyzed targeted dumping

allegations using the same mathematical test – the so-called "*Nails* test" – in both

investigations and reviews.  As described by Commerce in the *Final Results*, the

*Nails* test is conducted as follows:

> In the first stage of the test, the "standard-deviation test," we
> determined that the share of the alleged targeted time-period sales of
> subject merchandise (by sales volume) that are at prices more than
> one standard deviation below the weighted-average price of all sales
> under review, targeted and non-targeted.  We calculated the standard
> deviation on a product-specific basis (*i.e.*, by control number
> (CONNUM)) using the weighted-average prices for the alleged
> targeted time period and the time periods not alleged to have been
> targeted.  If that share did not exceed 33 percent, then we did not
> conduct the second stage of the *Nails* test.  If that share exceeded 33

percent, on the other hand, then we proceeded to the second stage of the Nails test.

In the second stage, we examined all sales of identical merchandise (*i.e.*, by CONNUM) sold during the alleged targeted time period which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for alleged targeted time period and the next higher weighted-average price of sales during the non-targeted time periods exceeds the average price gap (weighted by sales volume) for the non-targeted time periods. We weighted each of the price gaps between the non-targeted time periods by the combined sales volume associated with the pair of prices for the non-targeted time periods that defined the price gap. In doing this analysis, the alleged targeted time-period's sales were not included in the non-targeted time periods; the alleged targeted time-period's average price was compared only to the average prices for the non-targeted time period. If the share of the sales that met this test exceeded five percent of the total sales volume of subject merchandise during the alleged targeted time period, then we determined that time-period targeting occurred.

JA3288-9 (footnotes omitted). This statistical analysis, and the thresholds used therein, such as the 33 percent threshold in the standard deviation test and the five percent threshold for the price gap test, are not grounded in any statute or regulation. Rather, the *Nails* analysis was adopted by Commerce in a series of antidumping investigations beginning with *Certain Steel Nails From the United Arab Emirates: Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 3,945 (Dep't of Commerce Jan. 23, 2008).

If a sufficient volume of U.S. sales pass the *Nails* test, Commerce then compares the dumping margin that results from using the A-A method (without zeroing) with the dumping margin that would result from using the A-T method (with zeroing). *See* JA3289. If Commerce finds that there is a "meaningful difference" in the dumping margins, Commerce concludes that the A-A method cannot take into account the pattern of price differences identified in the *Nails* test, and Commerce uses the A-T comparison method (with zeroing) for all sales comparisons. *See id*. The *Nails* test has been upheld by the CIT. *Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 2010).

At no point in the *Nails* analysis does Commerce consider whether factors other than targeting may account for the observed pattern of price differences. Nor does Commerce consider whether the use of the A-A method can account for the observed price differences, other than to confirm the mathematical truism that dumping margins calculated using the A-T method with zeroing are meaningfully different from prices calculated under the A-A method without zeroing.

> **3.** **The Statute And SAA Provide That Commerce Is To Apply The A-T Methodology Only In Instances Of Targeted Or Masked Dumping.**

The applicable statutory provision provides as follows:

**Determination of less than fair value**

   **(1) Investigations**

      **(A) In general**

26

In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value—

**(i)** by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

**(ii)** by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

**(B) Exception**

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

**(i)** there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

**(ii)** the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1).  As discussed above, although this provision by its terms applies only to original investigations, Commerce's practice is to apply the same practice in administrative reviews – *i.e.* to calculate dumping margins using the A-A methodology except where it finds that targeted dumping is occurring, when it uses the A-T methodology without zeroing.  *See* discussion *supra* at V.D.

The SAA, which serves as "an authoritative expression by the United States concerning the interpretation and application of the {URAA} . . . in any judicial proceeding in which a question arises concerning such interpretation or application" (19 U.S.C. § 3512(d)), is clear that section 777A(d)(1)(B) of the Act was added as an exception in order to address a specific problem – "targeted" dumping:

> New section 771A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology *cannot account for* a pattern of prices that differ significantly among purchasers, regions or time periods*, i.e., where targeted dumping may be occurring.* Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. *In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.*

SAA at 843 (emphasis added). Thus, the SAA makes clear that Congress intended the identification of a "pattern" of EP/CEP prices that "differ significantly" by purchasers, regions or time periods was merely a threshold condition for considering the application of the targeted dumping methodology. In other words, the pattern of significantly different prices was not synonymous with targeted dumping, and only indicates that "targeted dumping may be occurring." Before

applying that methodology, Congress intended that Commerce would also

determine that the A-A methodology "cannot account" for those differences, and

the SAA makes clear that Congress expected that Commerce would make that

determination by considering whether targeted dumping was occurring.  This is

why Congress imposed the separate statutory requirement that Commerce must

establish and explain *why* the differences in prices cannot be taken account using

the A-A methodology.[6]  Furthermore, the SAA made clear that Commerce may not

rely solely on a purely mathematical or statistical analysis, but rather must evaluate

what constitutes a "significant" price difference on a case-by-case basis taking into

account the particular industry and products involved.  That is, Congress clearly

instructed Commerce to consider the qualitative, as well as the quantitative,

dimension of significance.

Commerce's mechanical approach to targeted dumping in the *Final Results*

is wholly inconsistent with this clearly stated Congressional intent.  First, it is

undisputed that Commerce has based its finding of a pattern of significant price

differences solely upon the application of the *Nails* test, which is a purely

statistical analysis that Commerce applies without modification in every

---

[6] "*Before* relying on this methodology, *however*, Commerce must *establish* and *provide* an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison."  SAA at 843.

investigation or review.[7]  Commerce gave no consideration to whether the

observed price differences after the month of February 2010 are properly regarded

as "significant" when they stem from increases in raw materials costs incurred by

Borusan.

Second, Commerce has wholly failed to comply with the second element of

19 U.S.C. § 1677f-1(d)(1)(B).  Even assuming that the mechanical application of

the statistical *Nails* test was sufficient to establish a "significant pattern" of price

differences under 19 U.S.C. § 1677f-1(d)(1)(B)(i), Commerce has not explained

why such differences cannot be taken into account using the normal A-T method as

required by 19 U.S.C. § 1677f-1(d)(1)(B)(ii).  That is, Commerce never examined

the differences other than finding that they existed as a result of the statistical

analysis performed.  Commerce therefore failed to consider whether the significant

pattern of price differences indicates that targeted dumping is occurring  (SAA at

843), in which case it cannot be taken into account using the normal method, or

whether the price differences are not indicative of targeting, in which case they can

be taken into account using the normal methodology.  The only means for

---

[7] Since the time of the instant review, Commerce has largely abandoned the *Nails* test in favor of a new and completely different statistical analysis it calls "differential pricing."  *See e.g. Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013).  However, Commerce continues to approach the question of whether a pattern of significant differences exist as a purely statistical issue.

completing that analysis is for Commerce to consider the basis for the price

differences so that it can establish whether a departure from the normal

methodology is justified and then explain its findings.  The entire statutory scheme

contemplates that departures from the A-A methodology will be the exception and

will be well-justified.[8]

The closest that Commerce comes to explaining why the price differences it

has identified using the *Nails* test cannot be taken into account using the A-A

method is its observation that there is a "meaningful difference" in the dumping

margins produced by the two methods:

> If the Department's two-step analysis confirmed the allegation of
> targeting and sufficient sales were found to have been targeted (*i.e.*, to
> have passed the two-step *Nails* test), then the Department evaluated
> the difference between the weighted-average dumping margin
> calculated using the average-to-average method and the weighted-
> average dumping margin calculated using the average-to-transaction
> method. Where there was a meaningful difference between the results
> of the average-to-average method and the average-to-transaction
> method, the average-to transaction method was applied to determine
> the appropriate weighted-average margin of dumping for the
> respondent in question.

*Post Preliminary Analysis* at 3, JA3202.  *See also Final Results*, Issues and

Decision Memo at 13, JA3290 ("Further, the Department continues to find that

there is a meaningful difference between the weighted-average dumping margins

---

[8] Even if both statutory the conditions are satisfied, the statute provides only
that Commerce *may* resort to the exceptional methodology, it is not required to do
so.

calculated using the average-to-average method and the average-to-transaction method.  As a result, the Department has used the average-to-transaction method to calculate the weighted-average margin of dumping for Borusan in these final results.").

Once again, this mechanical approach fails to satisfy the requirements of the statute.  As the CIT recently held in considering the same explanation in another review, Commerce's approach allows it to use the targeted dumping methodology *whenever* there is a significant pattern of price differences, because it is a mathematical truism that when prices differ, a method that averages prices will generate different results than one that uses individual transactions:

> {T}he Department's purported explanation says nothing more than that Commerce has found a pattern of differing prices and invokes the mathematical truism that, when you average a set of numbers, the differences among the individual numbers averaged, cease to be apparent. Thus, it is the case that any time a pattern of disparate pricing exists, averaging the prices will "mask" the differences in the individual prices.

*Beijing Tianhai Indus. Co. Ltd. v. United States*, No. 12-00203, Slip Op. 14-104 at 16 (Ct. Int'l Trade Sept. 9, 2014).  Thus, the court concluded, Commerce's approach effectively collapses the distinct requirements of 19 U.S.C. § 1677f-1(d)(1)(B)(i) and 19 U.S.C. § 1677f-1(d)(1)(B)(ii): "if no explanation other than the bare-bones invocation of the differing natures of the A-to-A and A-to-T methodologies would suffice to satisfy 19 U.S.C. § 1677f-1(d)(1)(B)(ii), as

defendant and defendant-intervenor would have it, that statutory provision would be superfluous." *Id.* at 17.

The conclusory assertion that using the A-T methodology generates higher dumping margins thus is not sufficient to explain why the price differences measured by the *Nails* test cannot be taken into account using the A-A methodology.

Furthermore, Commerce's obligation under the statute is to calculate dumping margins as accurately as possible, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), not to simply calculate the highest possible dumping margin.

In creating a limited exception to the normal methodology, Congress tightly restricted the circumstances in which it could be applied and imposed two conditions for its application. Exceptions should always be construed narrowly[9] and particularly in this case when it is evident from the SAA that Congress clearly anticipated that there would be instances in which a pattern of prices that differs significantly among purchasers, regions, or time periods can be accounted for

---

[9] *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) (noting that, "{i}n construing provisions…in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.").

using the normal comparison methodologies.[10]  *See Beijing Tianhai Indus. Co. Ltd.*, Slip Op. 14-104 at 17.  As the court noted in *Borden, Inc.*, 4 F. Supp. 2d at 1228: "Certainly, not all price variation, not even all statistically significant variation, results from targeted dumping."  The SAA further indicates that in deciding whether the price differences can or cannot be taken into account under the normal methodology, the question is whether targeting dumping is occurring.  In sum, simply identifying a significant pattern of prices difference under 19 U.S.C. § 1677f-1(d)(1)(B)(i) is not sufficient.

This Court has previously discussed the concept of targeted dumping under 19 U.S.C. § 1677f-1(1)(d)(B), explaining that:

> the exception contained in § 1677f-1(d)(1)(B) indicates that Congress gave Commerce a tool *for combating targeted or masked dumping* by allowing Commerce to compare weighted average normal value to individual transaction values when there is a pattern of prices that differs significantly among purchasers, regions, or periods of time.

*U.S. Steel Corp.*, 621 F.3d at1363.  This Court has furthermore explained that targeted or "masked" dumping involves instances "wherein certain profitable sales serve to 'mask' sales at less than fair value."  *Timken Co. v. United States*, 354 F.3d 1334, 1343 (Fed. Cir. 2004) (citations omitted).  The CIT has characterized targeted dumping in similar terms:

---

[10] "{A} pattern of prices that differ significantly among purchasers, regions or time periods*, i.e.,* where targeted dumping *may be occurring*."  SAA at 843 (emphasis added).

> The concept of targeted dumping is that a company might not be able to, or might choose not to, use a dumping strategy toward a whole market but might strategically focus on a more narrowly defined market . . . To ferret out this more complicated dumping, the statute instructs Commerce to look not only at the *magnitude* of price variance but also for a *pattern* of significant price differences.

*Borden, Inc.*, 4 F. Supp. 2d at 1228 (emphasis in original); *see also U.S. Steel Corp.,* 637 F. Supp. 2d at 1216 ("Targeted dumping occurs where a foreign exporter or producer selectively sells merchandise at less than fair value in certain product lines, to certain customers, at certain times of the year.").

These cases and the SAA articulate the common-sense notion that "targeted dumping" is just that – "selectively sell{ing} merchandise at less than fair value in certain product lines, to certain customers, at certain times of year." *U.S. Steel Corp.*, 637 F. Supp. 2d at 1216; *see also Borden, Inc.*, 4 F. Supp. 2d at 1228 (discussing targeted dumping as a "strategy").  Thus, in determining whether any observed pattern of significant price differences can be taken into account using the normal A-A methodology or whether these patterns of differences instead call for the use of the exceptional A-T methodology, Commerce's task is to evaluate whether "targeted dumping," as described above, "may be occurring."  In making this argument, Borusan does not contend, as the lower court suggested, that Commerce must make a finding as to "whether respondents intended to engage in targeted dumping," 990 F.Supp. 2d at 1389, JA9.  Nor is Borusan arguing that the

35

Court should "add a new element to the targeted dumping analysis." *Id.*, JA8-9.

Rather, Borusan is merely arguing that where, as here, record evidence negates the

conclusion that the observed pattern of price differences reflect targeted dumping –

*i.e.*, the record evidence establishes that the exporter is not "selectively sell{ing}

merchandise at less than fair value in certain product lines, to certain customers, at

certain times of year" – then Commerce must consider that evidence in both a

qualitative and quantitative way, and in the absence of targeted dumping should

find that the observed price differences can be taken into account under the normal

methodology.

> **4.    Record Evidence Confirms That Observed Price Differences Are Not Attributable To Targeted Dumping**

In this case, all of Borusan's sales during the POI were made to a single U.S.

customer.  JA49.  There is thus no possibility that Borusan selectively sold subject

merchandise at less than fair value to certain customers.  For the same reason, there

is also no possibility that Borusan selectively made less than fair value sales to

only certain regions of the United States.  Rather, Commerce's targeted dumping

finding rests solely upon a finding that the prices Borusan charged to its one U.S.

customer during February 2010 were significantly lower than the prices charged

during the later months of the POR to the same customer.  JA2824-5, JA3311-12,

3693-4, and 3704.  Based on this finding, which was solely based on the statistical

analysis of standard deviations and weighted-average price gaps that Commerce

has devised in the *Nails* test, *see* discussion *supra* at VII.A.2, Commerce concluded that it was appropriate to apply the A-T methodology, with zeroing, to all of Borusan's sales during the POR.

Commerce reached this conclusion even though undisputed record evidence establishes that the lower prices in February 2010 are the result of lower costs incurred by Borusan for hot-rolled steel coil compared to the higher coil costs in later months, not selective pricing by Borusan. Hot-rolled steel coil is the raw material from which standard pipe is formed and accounts for between [ ▮ ] and [ ▮ ] percent of the cost of production. JA1890. Borusan established not only that the hot-rolled coil costs increased significantly after that month, but also demonstrated that the increase is solely responsible for Commerce's finding of a significant pattern of price differences under the *Nails* test. When the test was re-run to account for hot coil cost differences by subtracting the cost of the hot-rolled steel coil from the U.S. sales price, none of Borusan's U.S. sales "passed" the *Nails* test for identifying patterns of significant price differences. JA3231-47. Finally, as discussed *supra* at V.B, Commerce itself had determined in a previous administrative review that Borusan's hot-rolled steel coil costs had fluctuated significantly over the review period and were linked to changes in Borusan's sales prices such that it was necessary to use a quarterly cost averaging method rather than the traditional yearly averaging to compare to prices in February. JA3153.

These facts, which are not disputed by Commerce, demonstrate conclusively that the only pattern of significant price differences identified here by the *Nails* test are *not* attributable to targeted dumping, but rather reflect a normal commercial reaction to increases in costs as well as price adjustments made to avoid dumping. *See* discussion *infra* at VII.B.  Commerce's application of the targeted dumping methodology in this case was therefore unsupported by substantial evidence.

At a minimum, in refusing to consider the undisputed record evidence submitted by Borusan showing why its prices differed between the allegedly targeted time period of February 2010 and the other months of the POR, Commerce violated its legal obligation to consider evidence that fairly detracts from its decision.  *See Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("We determine the existence of substantial evidence by considering the record as a whole, including…evidence that 'fairly detracts from the substantiality of the evidence.'") (*citing Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Commerce simply assumed that the price differences it observed between time periods were due to targeted dumping and did not consider evidence that directly contradicted such a conclusion.  This undisputed evidence demonstrated that the observed price differences were due to the fact that Borusan had adjusted its prices to cover changing hot-coil raw material costs.  This evidence thus "fairly detracted" – and in fact directly

contradicted – Commerce's conclusion that the price differences were the result of targeted dumping. *See Borden, Inc.*, 4 F. Supp. 2d at 1228 ("Certainly, not all price variation, not even all statistically significant variation, results from targeted dumping.").

### C.    Commerce's Statutory Interpretation  Fails to Take into Account the Statute as a Whole and Leads To An Absurd Result

Commerce's refusal to consider undisputed record evidence that price differences identified in the *Nails* test reflect increased raw materials costs rests upon its statutory interpretation that all that is required for the application of the alternative A-T methodology under § 1677f-1(d)(1)(B) is a pattern of price differences that differ significantly among purchasers, regions, or periods of time. According to Commerce and the lower court, that pattern of significant differences *is* "targeted dumping" under the statute. *Final Results* IDM at 12-13, JA3289-90; *see Borusan* 990 F. Supp. 2d  at 1389, JA8 ("…Commerce may make a finding of targeted dumping and apply the targeted dumping remedy based on the pricing pattern described in the statute and specifically articulated in the *Nails* test.").  As already discussed, this statutory construction disregards Congressional intent expressed in the SAA that Commerce is only to use the methodology on a case-by-case basis when it finds that "targeted dumping may be occurring" and it relegates to "mere surplusage" the separate requirement in § 1677f-1(d)(1)(B)(ii) that Commerce explain why the observed price differences cannot be taken into

account using the normal methodology. *Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("The subsequent part of the section is mere surplusage, is entirely without meaning, if such is to be the construction.").

Commerce's statutory interpretation is also unlawful because it leads to an absurd result that is fundamentally inconsistent with the overall structure and purpose of the antidumping law, of which § 1677f-1(d)(1)(B)(ii) is only one provision. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme…a court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit if possible, all parts into an harmonious whole." *In re City of Houston: in Re the Government of the District of Columbia*, 731 F.3d 1326, 1333 (Fed. Cir. 2013) (quoting *Food and Drug Administration et al. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). In response to increased costs of hot-rolled steel coil, Borusan raised its U.S. prices to account for this higher cost. This rational commercial behavior is precisely the opposite of seeking to "use a dumping strategy toward a whole market but {is instead} . . . strategically focus{ing} on a more narrowly defined market" to dump its merchandise. *Borden*, 4 F. Supp. 2d at 1228. To the contrary, Borusan was doing exactly what the antidumping law requires a company to do in order to avoid dumping in the U.S. market – adjust its prices so that it sells its products in the

United States at prices *above* their cost of production.  *See* 19 U.S.C.

§ 1677b(b)(1).

   In interpreting the targeted dumping provision in such a way as to penalize

Borusan for adjusting its prices to reflect changing costs, Commerce's

interpretation leads to an absurd result that is contrary to the purpose of the statute

and should not be sustained.  *Wirtz v. Glass Bottle Blowers Ass'n*, 389 U.S. 463,

468 (1968) (A "proper construction frequently requires consideration of {a

statute's} wording against the background of its legislative history and in light of

the general objectives Congress sought to achieve.");  *Armstrong Paint & Varnish

Works v. Nu-Enamel Corp.,* 305 U.S. 315, 333 (1938) ("to construe statutes so as

to avoid results glaringly absurd, has long been a judicial function."); *Witco

Chemical Corp. v. United States*, 742 F.2d 615, 619 (Fed. Cir. 1984) ("We agree

with the Claims Court that 'an absurd construction of a statutory provision should

be avoided.'").  Here, the construction adopted by Commerce places Borusan in an

impossible "catch-22."  If it fails to adjust its U.S. prices in response to higher coil

costs, it will either be found to be selling below its home market prices (assuming

it does adjust its home market prices) or it will be found to be selling below

constructed value (if it does not adjust its home market prices and they fall below

the cost of production).  In either case, Borusan will be found to be engaging in

dumping and will need to incur dumping duties on its imports.  However, if it

adjusts its prices to reflect the higher costs, then Commerce will apply the A-T methodology with zeroing to all of Borusan's sales, thereby still resulting in a dumping margin even though the normal and statutorily preferred A-A methodology would confirm no dumping. Commerce's use of the A-T methodology (including zeroing) in this circumstance is thus the antithesis of "unmasking" dumping.

Commerce itself has recognized in past cases that it should at least consider whether factors other than targeted dumping account for price variations. For example, in *Polyvinyl Alcohol From Taiwan: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 5,562 (Dep't of Commerce Feb. 1, 2011), and accompanying Issues and Decision Memorandum at Comment 1, Commerce considered evidence that rising raw material costs were responsible for price differences observed between different time periods. Although concluding that such evidence did not support the argument that the rising raw material costs accounted for the observed price differences between time periods in that particular case, Commerce did analyze and discuss this evidence. And in *Certain Steel Nails From the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 17,029 (Dep't of Commerce Mar. 23, 2012), and accompanying Issues and Decision Memorandum at Comment 1, Commerce similarly analyzed evidence submitted by the respondent indicating that rising raw

material costs accounted for the observed price differences. While maintaining that such an analysis was not necessary under the statute, Commerce carefully reviewed and explained why the data did not detract from its targeted dumping determination. Yet here, Commerce wholly failed to address, let alone explain, why the evidence Borusan submitted regarding changing hot-coil costs was not relevant to its targeted dumping finding.

## VIII.  **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

Based on the foregoing, Plaintiff Borusan respectfully requests that this Court: (1) hold that Commerce's targeted dumping determination in the *Final Results* is unsupported by substantial evidence and is otherwise not in accordance with law, and (2) remand the case to Commerce with instructions to recalculate Borusan's dumping margin using its standard A-A comparison methodology without zeroing.

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Sarah S. Sprinkle

MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Borusan*

Dated:  October 24, 2014

44

## <u>ADDENDUM OF REQUIRED DOCUMENTS</u>

### CONTENTS

| Tab No. | Document Title | Page |
|---------|----------------|------|
| 1 | *Borusan Mannesmann v. United States,* U.S. Court of International Trade Case No. 13-00001, Judgment (June 25, 2014) | JA000001 |
| 2 | *Borusan Mannesmann v. United States,* U.S. Court of International Trade Case No. 13-00001, Slip Op. 14-71 (June 25, 2014) | JA000002 |

**Tab 1**

***Borusan Mannesmann v. United States,*** **U.S. Court of
International Trade Case No. 13-00001, Judgment (June 25,
2014)**
**JA000001**

UNITED STATES COURT OF INTERNATIONAL TRADE

BORUSAN MANNESMANN
BORU SANAYI VE TICARET A. S.,

          Plaintiff,

          v.

UNITED STATES,

          Defendant,
   and

UNITED STATES STEEL
CORPORATION,

          Defendant-Intervenor.

Before: Judith M. Barzilay, Senior Judge

Court No. 13-00001

## JUDGMENT

Upon consideration of Plaintiff's motion for judgment on the agency record, Defendant's response in opposition, and all other papers in this action, and upon due deliberation, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained.

Dated: June 25, 2014
    New York, NY

          /s/ Judith M. Barzilay
          Judith M. Barzilay, Senior Judge

**Tab 2**

***Borusan Mannesmann v. United States,*** **U.S. Court of International Trade Case No. 13-00001, Slip Op. 14-71 (June 25, 2014)**
**JA000002**

Slip Op. 14- 71

UNITED STATES COURT OF INTERNATIONAL TRADE

BORUSAN MANNESMANN
BORU SANAYI VE TICARET A. S.,

        Plaintiff,

        v.

UNITED STATES,

        Defendant,
   and

UNITED STATES STEEL
CORPORATION,

        Defendant-Intervenor.

Before: Judith M. Barzilay, Senior Judge

Court No. 13-00001

## OPINION

[Commerce's Final Results are sustained.]

Dated: June 25, 2014

*Morris, Manning & Martin, LLP (Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Sarah S. Sprinkle)*, for Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was *Whitney Rolig*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Skadden, Arps, Slate, Meagher & Flom LLP (Jeffrey D. Gerrish, Robert E. Lighthizer, Jamieson L. Greer)*, for Defendant-Intervenor United States Steel Corporation.

BARZILAY, Senior Judge:  Before the court is Plaintiff Borusan Mannesmann Boru

Sanayi ve Ticaret A. S.'s ("Borusan") motion for judgment on the agency record under USCIT

Rule 56.2, challenging Defendant U.S. Department of Commerce's ("Commerce") final results

of the antidumping duty annual review covering welded carbon steel pipe and tube from Turkey.

*See Circular Welded Carbon Steel Pipes and tubes from Turkey; Final Results of Antidumping*

*Duty Administrative Review; 2010 to 2011*, 77 Fed. Reg. 72,818 (Dept't Commerce Dec. 6,

2012) ("*Final Results*"), as amended by *Circular Welded Carbon Steel Pipes and Tubes from*

*Turkey; Amended Final Results of Antidumping Duty Administrative Review; 2010 to 2011*, 78

Fed. Reg. 286 Dep't Commerce Jan. 3, 2013) ("*Amended Final Results*"); *Issues and Decision*

*Memorandum for the Final Results of the Antidumping Duty Administrative Review: Circular*

*Welded Carbon Steel Pipes and Tubes from Turkey – May 1, 2010, through April 30, 2011*, A-

489-501 (Nov. 30, 2012), Docket Entry No. 22 (Feb. 15, 2013) ("*Issues and Decision*

*Memorandum*").  Specifically, Borusan challenges Commerce's determination that Borusan

engaged in targeted dumping and application of its average-to-transaction comparison

methodology.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  For the reasons set

forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. §

1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains

Commerce's "determinations, findings, or conclusions" unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or

conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

Borusan is a manufacturer and exporter of circular welded carbon steel pipes and tubes from Turkey. Borusan and other interested parties requested that Commerce conduct an administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes. On June 28, 2011, Commerce initiated an administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Turkey for the period of May 1, 2010, through April 30, 2011, and selected Borusan as one of the mandatory respondents. *See Initiation*

*of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 76 Fed. Reg. 37,781 (Dep't Commerce June 28, 2011). Before Commerce issued the preliminary determination, one of the petitioners filed an allegation that Borusan engaged in targeted dumping during the period of review. Commerce, however, deferred conducting a targeted dumping analysis and published its preliminary results. *See Circular Welded Carbon Steel Pipes and Tubes From Turkey: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 32,508 (Dep't Commerce June 1, 2012). Commerce assigned Borusan a preliminary weighted average dumping margin of zero using its average-to-average comparison methodology ("A-A"). *See id.* at 32,512. Commerce then decided to review the petitioner's targeted dumping allegation and published a post-preliminary determination that analyzed the petitioner's targeted dumping allegation. Commerce applied its *Nails* test and determined that a pattern of export sales prices that differed significantly within the period of review existed. Additionally, after concluding that a sufficient volume of export sales passed the *Nails* test, Commerce determined that the A-A methodology could not take into account the observed price pattern since it found a meaningful difference between the results of the A-A methodology and the average-to-transaction ("A-T") methodology, thus warranting application of the A-T methodology. Accordingly, Commerce assigned Borusan a post-preliminary dumping margin of 2.12%. *See Circular Welded Carbon Steel Pipes and Tubes from Turkey 2010 -- 2011 Administrative Review: Post-Preliminary Analysis and Calculation Memorandum*, A-489-501 (Oct. 22, 2012), Docket Entry No. 69 Tab 8 (Feb. 7, 2014). In the *Final Results*, Commerce concluded that Borusan did engage in targeted dumping, but revised Borusan's rate and assigned a final dumping margin of 6.05%. *See Final Results*, at 72,820. Commerce revised

the final rate to correct a ministerial error and assigned Borusan an amended final dumping

margin of 3.55%. *See Amended Final Results*, at 287.

## III. DISCUSSION

Borusan argues that Commerce violated 19 U.S.C. § 1677f-1(d)(1)(B) by not considering

Borusan's explanation for why its sales demonstrated a pattern of targeted dumping. Pl. Br. 18.

More specifically, Borusan argues that targeted dumping "connote[s] a purposeful act or

behavior" and therefore takes the position that Commerce must consider whether a respondent

intended to engage in targeted dumping to satisfy the statute. *Id.* at 20.  Borusan, moreover, relies

on the Statement of Administrative Action accompanying the Uruguay Round Agreements Act

("SAA") to advance its argument that the statute contains an implicit requirement that

Commerce consider the "motive" behind its pricing practices before applying the targeted

dumping remedy. Pl. Reply Br. 5 (citing SAA, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess.

(1994)).  Borusan's argument is not persuasive.

Section 1677f-1(d)(1)(B) provides:

The administering authority may determine whether the subject merchandise is
being sold in the United States at less than fair value by comparing the weighted
average of the normal values to the export prices (or constructed export prices) of
individual transactions for comparable merchandise, if—

> (i) there is a pattern of export prices (or constructed export prices) for
> comparable merchandise that differ significantly among purchasers,
> regions, or periods of time, and

> (ii) the administering authority explains why such differences cannot be
> taken into account using [the A-A methodology or the T-T methodology].

§ 1677f-1(d)(1)(B).  The "'pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or periods of time' is what is

referred to as 'targeted dumping.'" *Timken Co. v. United States*, 38 CIT __, __, No. 14-24, Slip

Op. at 4 (2014). Targeted dumping, therefore, is a statutorily defined pricing pattern that permits

Commerce to apply an alternative comparison methodology in antidumping investigations and

reviews. The SAA provides:

> New section 771A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions or time periods, *i.e.*, where targeted dumping may be occurring. Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

SAA at 843.

Commerce has established a methodology known as the *Nails* test to determine whether a

pattern exists for purposes of § 1677f-1(d)(1)(B). *See Certain Steel Nails from the People's*

*Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative*

*Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008);

*Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at*

*Not Less than Fair Value*, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008). The *Nails* test

involves a two-step analysis:

> In the first stage of the test, the "standard deviation test," requires the Department to determine the share of the alleged target's (whether purchaser, region, or time period) purchases of identical merchandise, by sales value, that are at prices more than one standard deviation below the average price of that identical merchandise to all customers. The standard deviation and the average price are calculated using a POI-wide average price weighted by sales value to the alleged target, and POI-wide average price weighted by sales value to each distinct non-targeted entity of identical merchandise. If the total sales value that

meets the standard deviation test exceeds 33 percent of the sales value to the alleged target of the identical merchandise, then the pattern requirement is met.

In the second stage, the Department examines all the sales of identical merchandise that pass the standard deviation test and determines the sales value for which the difference between the average price to the alleged target and the lowest non-targeted average price exceeds the average price gap (weighted by sales value) observed in the non-targeted group. If the share of these sales exceeds five percent of the sales value to the alleged target of the identical merchandise, then the significant difference requirement is met and the Department determines that targeted dumping has occurred.

*Memorandum to David Spooner*, titled "*Antidumping Duty Investigations of Certain Steel Nails from the Peoples Republic of China (PRC) and the United Arab Emirates (UAE): Post-Preliminary Determinations on Targeted Dumping*," A-520-802 and A-570-909 (April 21, 2008), at 8. The Court has sustained the *Nails* test as reasonable. *See Mid Continent Nail Corp. v. United States*, 34 CIT ___, 712 F. Supp. 2d 1370 (2010).

The statute is clear. Contrary to Borusan's claim that targeted dumping connotes purposeful behavior, the language of the statute simply instructs Commerce to consider export sales price (or constructed export sales price) in its targeted dumping analysis. *See* § 1677f-1(d)(1)(B). It does not require Commerce to undertake an investigation of the various reasons why a pattern of targeted dumping exists within a given time period. The SAA does not manifest such a requirement either. It reaffirms the language in the statute but adds very little other than what is already expressed in § 1677f-1(d)(1)(B). Therefore, Commerce may make a finding of targeted dumping and apply the targeted dumping remedy based on the pricing pattern described in the statute and specifically articulated in the *Nails* test. The court cannot identify any language in the statute or SAA that might require Commerce to investigate whether a given respondent has a legitimate commercial reason for such a pricing practice. Doing so would add a

new element to the targeted dumping analysis, requiring Commerce to also consider whether

respondents intended to engage in targeted dumping.  The Federal Circuit has rejected this type

of intervention. *See Viraj Group v. United States*, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007).  The

court, therefore, cannot read into the statue some sort of "intent" requirement that does not exist.

It would impose a "burden on Commerce that is not required or suggested by the statue." *Viraj*

*Group*, 476 F.3d at 1358.  Given that Borusan's claim is predicated on Commerce going beyond

what is required by the statute, there is no need to review Commerce's factual determination

under the substantial evidence framework.

## IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained.  Judgment will be

entered accordingly.


Dated:  June 25 , 2014                                                  /s/ Judith M. Barzilay
            New York, NY                                       Judith M. Barzilay, Senior Judge

**<u>PROOF OF SERVICE</u>**
**U.S. Court of Appeals for the Federal Circuit**
***Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States***
**2014-1744**

Pursuant to Federal Circuit Rule 25 and the Administrative Order Regarding Electronic Case Filing 2(D), I hereby certify that on the 24th day of October 2014, I have caused service of the foregoing non-confidential brief by electronic filing with the Clerk of the Court using the CM/ECF System, which will send a Notice of Docketing Activity to all parties with an email address of record:

**Douglas Glenn Edelschick, Esq.**
Department of Justice
Commercial Litigation Branch, Civil DivisionProof
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email: douglas.edelschick@usdoj.gov

Thomas M. Beline, Esq.
**Cassidy Levy Kent (USA) LLP**
2000 Pennsylvania Avenue, NW
Suite 3000
Washington, DC 20006
Email: tbeline@cassidylevy.com

/s/Julie C. Mendoza

**Form 19**

**FORM 19.  Certificate of Compliance With Rule 32(a)**

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [        *10,286*        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑     The brief has been prepared in a proportionally spaced typeface using [          *Microsoft Word 2010*          ] in [          *Font Size 14 and Times New Roman*          ], or

☐     The brief has been prepared in a monospaced typeface using [                        ] with [ [                        ].

/s/ Julie C. Mendoza
_____
(Signature of Attorney)

Julie C. Mendoza
_____
(Name of Attorney)

Appellant
_____
(State whether representing appellant, appellee, etc.)

10/24/2014
_____
(Date)

Reset Fields